UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jax Ltd., Inc.,                                                     Civil No. 05-2658 (DWF/SRN)

              Plaintiff,

v.                                                        **MEMORANDUM**
                                                          **OPINION AND ORDER**

Douglas E. Reuter,

              Defendant.

_____

Matthew D. Spohn, Esq., and Robert R. Weinstine, Esq., Winthrop & Weinstine, P.A., counsel for Plaintiff.

Donald W. Niles, Esq., and Tye Biasco, Esq., Patterson Thuente Skaar & Christensen, P.A., counsel for Defendant.

_____

**Introduction**

The above-entitled matter came before the undersigned United States District Court Judge on November 21, 2005, pursuant to Plaintiff Jax Ltd., Inc.'s ("Jax") Motion for a Temporary Restraining Order ("TRO") against Defendant Douglas E. Reuter ("Reuter"). Specifically, Jax requests that the Court enter a TRO to: (1) prohibit Reuter from communicating with anyone except his attorneys and Jax about this lawsuit; (2) prohibit Reuter from initiating any communications with any entity (or representative thereof) known, believed or suspected by Reuter to be a supplier, distributor, reseller or retailer of Jax; (3) prohibit Reuter from canceling or otherwise altering his license to Jax under the parties' agreement; and (4) require Jax to continue to make and account for royalty payments to Reuter as provided in the parties' agreement. Additionally, Jax brought a Motion to Strike Exhibits G and H from the Declaration of Donald W. Niles in Support of Defendant's Points and Authorities in

Opposition to Plaintiff's Motion for a TRO ("Niles' Declaration").  In its Verified Complaint (the "Complaint"), Jax asserts a cause of action for breach of contract and requests declaratory judgment and injunctive relief arising from the alleged breach.  On November 21, 2005, the Court granted in part and denied in part Jax's Motion for a TRO and granted Jax's Motion to Strike.  The case was originally filed under seal, but the Court ordered that the case be unsealed in its November 21, 2005 Order.[1]

## Background

Jax is a Minnesota corporation that develops, manufactures, sells, and distributes family games. (Complaint at ¶ 3.)  Reuter invented a game called "Sequence Five."  (*Id.* at ¶ 11.)  In 1981, Jax and Reuter entered a license agreement (the "Agreement") that gave Jax the exclusive right to manufacture, distribute, and sell "Sequence Five."  (*Id.*)  The Agreement is automatically renewed each year provided that Reuter is paid $2,500 minimum annual royalties. (Complaint, Ex. A at 2–3.)  The Agreement has been renewed every year since the parties signed it.  (Complaint at ¶ 13.)  The Agreement requires Jax to "make reasonable efforts to manufacture, distribute and sell the Licensed product."  (Complaint, Ex. A at 5.)  The Agreement also requires Reuter to "fully cooperate with [Jax] in the manufacture, distribution and sale of the Licensed Product."  (*Id.*)  In addition, the Agreement provides that Reuter may terminate the Agreement if Jax does not cure any performance default within 30 days after notice of such default from Reuter.  (*Id.* at 7.)

---

1   In granting Jax's Motion to Strike Exhibits G and H from Niles' Declaration the Court declines to unseal Exhibits G and H because they are irrelevant.  The Court notes Reuter's objection.

After signing the Agreement, Sequence Five was renamed "Sequence®." (Complaint at ¶ 14.) Jax alleges that retailers such as Target and Wal-Mart declined to sell Sequence® in the early 1980s. (*Id.*) According to Jax, it continued to lobby major retailers, but invested substantial amounts of time, effort, and money to build a sales network of independent game retailers, specialty stores, and regional chains. (*Id.*) Jax also contends that it expanded this network by marketing Sequence® through advertising, national trade shows, trade association activities, and in-store demonstrations. (*Id.* at ¶ 15.)

In 1991, after years of lobbying, Jax convinced Target to sell Sequence® on a trial basis. (*Id.* at ¶ 16.) Jax alleges, however, that Target threatened to cancel its plan to sell Sequence® after Reuter independently contacted and pressured a Target store manager about the game. (*Id.*) Jax alleges that it alleviated Target's dissatisfaction with Reuter's behavior and that Target has sold Sequence® since 1991. (*Id.*) Jax also alleges that it allayed the fears of independent game retailers, specialty stores, and regional chains that Target's sales would interfere with their own. (*Id.* at ¶ 18.) Jax also currently sells Sequence® to Mills Fleet Farm and K-Mart. (Niles' Declaration, Ex. C.)

Additionally, around 1991, Jax alleges that it received a call from another game company that stated Reuter had contacted it about manufacturing and selling Sequence®. (Complaint at ¶ 17.) The company indicated that Reuter represented that he would soon recover the licensing rights to the Sequence® game because Jax was in default under the Agreement. (*Id.*) Jax, however, alleges that Reuter did not make a similar representation to it at that time. (*Id.*) Jax indicates that these actions, among others, led to the "Amendment No. 1" to the Agreement, which represented a "compromise of disputed issues between the parties." (*Id.*)

Jax expanded the Sequence® Brand by creating alternative versions of Sequence®. (*Id.* at ¶ 19.) Jax developed a travel version of Sequence® in 1994, a Sequence® dice game in 1999, and a Sequence® game for children in 2001. (*Id.* at ¶¶ 19–20.) Jax alleges that Reuter refused to assist Jax with the development of these games, but that Jax nonetheless paid Reuter royalties on these games. (*Id.*) Jax also paid Reuter royalties on deluxe, jumbo, and multi-lingual versions of Sequence®, as well as versions packaged in both boxes and tins that Jax developed. (*Id.* at ¶ 22.) Additionally, Jax paid Reuter royalties on promotional items with the Sequence® name, such as tee shirts, even though the Agreement does not provide for such royalties. (*Id.*)

Jax also expanded the distribution of Sequence® products. In 1997, Jax negotiated a sublicense agreement with Hasbro, one of the world's largest toy and game retailers, to carry the Sequence® product line outside the United States. (*Id.* at ¶ 24.) In 2004, Jax negotiated an agreement with a distributor to sell Sequence® products in Mexico. (*Id.* at ¶ 25.) Jax has also established distributorships in Canada. (*Id.*)

These efforts have enabled Jax to grow its annual sales of Sequence® products. In 2004, the annual sales topped $5,000,000. (*Id.* at ¶ 28.) Reuter has received annual royalties exceeding $200,000 every year since 1995, and in five of the last seven years Reuter's royalties have exceeded $300,000. (*Id.* at ¶ 29.) To date, Jax has paid Reuter more than $3,000,000 in royalties. (*Id.* at ¶ 30.) The sales of Sequence® products constitute 80 percent of Jax's annual revenue. (*Id.* at ¶ 35.)

On November 7, 2005, Reuter's attorney sent a letter to Jax, alleging that Jax had materially breached the Agreement by refusing to sell Sequence® products to Wal-Mart. (Complaint, Ex. C) The letter states that if the breach is not cured within 30 days, Reuter will terminate Jax's license. (*Id.*)

Jax maintains that it exercised sound and reasonable business judgment by declining to sell Sequence® products at Wal-Mart, as it believes that retailing its products through Wal-Mart will cause Jax's other retailers to cease carrying its products. (Complaint at ¶ 32.) Jax also contends that its network of independent retailers and specialty stores believes Wal-Mart displaces independent retailers. (*Id.*) Furthermore, Jax contends that Wal-Mart's image and market positions are incompatible with its own. (*Id.*)

## Discussion

### I. Standard of Review

A temporary restraining order may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). None of the factors by itself is determinative; rather, in each case the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### A. Likelihood of Success on the Merits

The first *Dataphase* factor requires that the movant establish a substantial probability of success on the merits of its claim. *See Dataphase*, 640 F.2d at 114.

Jax asserts that it is virtually certain to prevail in establishing that it has used reasonable efforts to

manufacture, sell, and distribute Sequence® products, and thus has not committed a material breach as Reuter alleged in his letter of November 5, 2005. Jax points out that it has expended considerable time and expense in establishing an independent sales network that helped generate over $5,000,000 in annual sales. Jax further points out that Reuter has received more than $3,000,000 in royalties to date. Jax asserts that its efforts in growing an independent sales network ensures the long-term security of Sequence® game sales and serves to protect the integrity of the product line. Reuter, on the other hand, asserts that refusing to sell to Wal-Mart—the world's largest retailer—is not reasonable. Reuter's attorney sent Jax a letter on November 5, 2005, alleging that Jax's refusal to sell Sequence® games to Wal-Mart "constitutes a material breach of Jax's contractual obligation to use reasonable efforts" to sell the product. (Complaint, Ex. C.) The letter states that Reuter will terminate the Agreement if Jax does not "cure" the alleged breach within 30 days. (*Id.*)

The Court finds that Jax has established a substantial probability that it will prevail in showing that it did, in fact, use reasonable efforts to sell Sequence® products. Jax will likely demonstrate that it spent considerable efforts to establish a network of independent retailers through which it sells Sequence® products, and that this network will be jeopardized if Jax agrees to have Wal-Mart distribute Sequence® games. Thus, Jax has established a substantial probability that it will be successful in demonstrating that it used reasonable efforts to sell Sequence® products and, therefore, has not materially breached the Agreement.

### B.     Irreparable Harm

The second factor that the movant must establish is that irreparable harm will result if injunctive relief is not granted and that such harm will not be compensable by money damages. *See Packard*

*Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). A showing of speculative harm is insufficient to meet this burden. *Id.* Failure to show irreparable harm alone is a sufficient basis for a court to deny injunctive relief. *Gelco Corp.*, 811 F.2d at 420.

Jax asserts that it will suffer irreparable harm absent the granting of a TRO because Reuter has threatened to cancel the Agreement with Jax. Jax asserts that during the past 24 years of marketing, distributing, and selling Sequence®, Jax has formed numerous relationships with retailers and sales representatives. Jax further asserts that if Reuter carries out his threat to cancel the Agreement during the upcoming holiday shopping season, he will destroy the relationships that Jax has spent years developing. According to Jax, if its relationships regarding the Sequence® game are harmed, Jax's entire business operations will be harmed because Sequence® sales comprise 80 percent of Jax's annual revenue. Additionally, Jax asserts that even if Reuter only publicizes his threat to cancel the Agreement, Jax would suffer irreparable harm because Jax would lose credibility with its Sequence® suppliers, distributors, and retailers. Jax asserts that its suppliers, distributors, or retailers could abandon Jax's business for fear that Jax would be unable to meet order or delivery requirements, thereby destroying Jax's trust-based relationships.

Reuter asserts that Jax cannot establish a threat of irreparable harm because there would be no harm if Jax sells Sequence® to Wal-Mart. Reuter points out that other major retailers, such as Target, Fleet Farm, and K-Mart, already sell Sequence®, without demonstrated harm.[2]

---

2     Admittedly, both parties have asserted to the court that expert testimony supports their respective positions on the issue of "reasonable efforts" and the effect on Jax's business if Wal-Mart begins distributing Sequence®.

The Court finds that Jax has established it will suffer irreparable harm in the absence of a TRO. Jax has shown that it will likely suffer a loss of business relationships with its Sequence® suppliers, distributors, and retailers if Reuter cancels the Agreement. The Sequence® product line constitutes 80 percent of Jax's business. This harm will be irreparable because no legal remedy can mend damaged or destroyed business relationships.

### C.   Balance of Harms

The third *Dataphase* factor to be considered is whether the harm to the movant in the absence of injunctive relief outweighs the potential harm that granting injunctive relief may cause to the non-movant. *See Dataphase*, 640 F.2d at 114. Jax asserts that he would face severe and irreparable harm of having its reputation and long-term business relationships damaged if the Court does not issue injunctive relief. It further asserts that Reuter would not suffer any harm if the Court issues injunctive relief. Jax asserts that Reuter would remain in the same position that he has been in for the past 24 years, continuing to receive royalty checks.

Reuter, on the other hand, asserts that Jax will suffer no harm from selling Sequence® to Wal-Mart. Reuter alleges that he will suffer a restriction on his first amendment rights, however, if the Court issues injunctive relief ordering him not to talk about the lawsuit or the underlying facts.

The Court finds that the effect of granting the TRO would be potentially devastating to Jax and that the effects of denying the motion would be much less significant for Reuter. Accordingly, this factor weighs in favor of Jax.

### D.   Public Interest

The final *Dataphase* factor to be considered by a court is whether injunctive relief is in the

public's interest. *See Dataphase*, 640 F.2d at 114. Jax asserts that the interests of the public will not be served by permitting Reuter to avoid his contractual obligations, especially when Jax has adhered to the Agreement. Reuter asserts that injunctive relief is not in the public's interest because it will restrict Reuter's freedom of speech and restrict competition. The Court finds that the public interest is best served by preserving the status quo, and the Agreement of the parties, until the parties can fully adjudicate their dispute regarding whether Jax breached the Agreement by refusing to sell Sequence® to Wal-Mart. The Court does, however, agree with Reuter that restricting his first amendment rights does not serve the public's interest. Thus, the Court declines to restrict Reuter from discussing the status of the case or the fact that a case has been filed.

## Conclusion

In accordance with the Court's November 21, 2005 Order, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff Jax's Motion for a TRO (Doc. No. 2) is **GRANTED IN PART** and **DENIED IN PART**.

    a. Until further notice from the Court, Reuter is prohibited from initiating any communications with any entity (or representative thereof) known, believed or suspected by Reuter to be a supplier, distributor, reseller, or retailer of Jax or proposed supplier, distributor, reseller, or retailer of Jax. Jax shall continue to retain the exclusive right to manufacture, distribute, and sell the Sequence® game under the Agreement.

    b. Until further notice from the Court, the 30-day "cure period" of the Agreement is tolled, and Reuter is prohibited from canceling or otherwise altering his

license to Jax under that Agreement.

  c. Jax shall continue to make and account for royalty payments to Reuter as provided in the Agreement.

  d. Jax shall post a bond of $100,000 consistent with the timeframe delineated in the Court's November 21, 2005 Order.

  e. While Reuter is prohibited from interfering with the business relationships of Jax and its clients and customers and proposed clients and customers, neither party is prohibited from discussing the status of the case or the fact that a case has been filed.

2. Plaintiff Jax's Motion to Strike is **GRANTED** to the extent the Court directs that Exhibits G and H of Niles' Declaration be sealed.

3. The file is now unsealed except for Exhibits G and H of Niles' Declaration, consistent with the Court's remarks off the bench on November 21, 2005.

Dated:  November 28, 2005   s/Donovan W. Frank
             DONOVAN W. FRANK
             Judge of United States District Court